IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jermane B.,[1] | ) | C/A No.: 1:20-cv-2983-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain, United States District Judge, dated August 25, 2020, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.     Relevant Background

A.     Procedural History

On August 31, 2017, Plaintiff filed an application for DIB in which he alleged his disability began on December 31, 2016.[2] Tr. at 59, 144–45, 153–54. His application was denied initially and upon reconsideration. Tr. at 80–83, 86–91. On September 6, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ann G. Paschall. Tr. at 32–50 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 4, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–31. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 19, 2020. [ECF No. 1].

---

[2] Plaintiff initially indicated in his application that his disability began on November 28, 2016. Tr. at 144. Upon reviewing his application, he amended it to reflect that he became unable to work because of his disabling condition on December 31, 2016. Tr. at 153.

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 41 years old at the time of the hearing. Tr. at 37. He completed the eleventh grade. *Id.* His past relevant work ("PRW") was as a forklift operator and a warehouse worker. Tr. at 46. He alleges he has been unable to work since December 31, 2016. Tr. at 153.

2.    Medical History

In November 2015, cardiologist John Andrew Manfredi, M.D. ("Dr. Manfredi"), performed radiofrequency catheter ablation for typical atrioventricular nodal reentrant tachycardia ("AVNRT") and pulmonary vein isolation ("PVI") for paroxysmal atrial fibrillation. Tr. at 372. Plaintiff endorsed recurrent symptoms following the procedure, but had negative event monitoring. *Id.* His medical provider stopped Rythmol and anticoagulation medication and prescribed aspirin and betablockers. *Id.* Plaintiff continued to endorse persistent symptoms and increased fatigue and stopped his medications on his own. *Id.* He visited the emergency room ("ER") at Self Regional Healthcare for palpations in July 2016 and no dysrhythmia was noted during the visit. *Id.* An event monitor was again placed and showed sinus tachycardia, but no supraventricular tachycardia or atrial fibrillation. *Id.* Plaintiff continued to describe rapid heart rate with minimal or no provocation and reduced functional capacity. *Id.* He received a

prescription for Corlanor in September 2016. *Id.* He also started Sotalol 80 mg the same month. Tr. at 248.

Plaintiff underwent a regular exercise stress test on December 8, 2016, that showed a normal electrocardiogram ("EKG") component of the standard Bruce protocol treadmill study, good exercise tolerance, and normotensive response to exercise. Tr. at 467–68.

On January 17, 2017, Plaintiff presented to the ER at Laurens County Memorial Hospital ("LCMH") for left-sided, non-radiating chest pain occurring off and on and accompanied by dizziness and nausea. Tr. at 247. He stated the palpitations began when he was at rest and were accompanied by mild shortness of breath. *Id.* His blood pressure was slightly elevated at 141/92 mmHg and his pulse was elevated at 112 beats per minute ("BPM"). Tr. at 250. Plaintiff's cardiac enzymes were normal. Tr. at 251. Randall Louis Reinhardt, M.D. ("Dr. Reinhardt"), recorded normal findings on physical exam, aside from slight tachycardia, and noted Plaintiff appeared to be in no pain or distress. Tr. at 250. He stated Plaintiff's heart rate was in sinus rhythm. Tr. at 252. He indicated Plaintiff might be experiencing intermittent atrial fibrillation, but he did not appreciate an acute cause for the palpitations. *Id.* He recommended Plaintiff improve his sleep and avoid alcohol. *Id.*

On February 27, 2017, Plaintiff denied symptoms of atrial fibrillation, but described fast regular heart rates since starting Sotalol. Tr. at 495. He indicated he would become profoundly asthenic once his heart rate exceeded 115 to 120 BPM, such that he could not work. *Id.* He endorsed fatigue/malaise and irregular heartbeat. *Id.* Plaintiff's blood pressure was elevated at 144/86 mmHg, and his pulse was 91 BPM. Tr. at 497. Dr. Villareal recorded normal findings on physical exam. Tr. at 497–98. He assessed paroxysmal atrial fibrillation, status post-ablation of atrial fibrillation, atrioventricular nodal reentry tachycardia ("AVNRT"), essential hypertension, inappropriate sinus tachycardia, and status post-catheter ablation of slow pathway. Tr. at 498. He noted Sotalol was not holding sinus tachycardia and Corlanor could not be used, as it triggered atrial fibrillation. *Id.* He instructed Plaintiff to discontinue Sotalol, wait two days, and start Cardizem ER 120 mg. *Id.* He stated sinus node modification was an option, but clinical experience was "very variable." *Id.* He instructed Plaintiff to obtain proper nutrition, engage in regular exercise, and avoid tobacco, alcohol, and other drugs. *Id.*

Plaintiff again presented to the ER at LCMH on March 6, 2017, with palpitations and associated shortness of breath and chest discomfort. Tr. at 261. He indicated he had discontinued Sotalol the prior week, per his cardiologist's instruction, but had not yet started Cardizem. *Id.* Plaintiff's

blood pressure was elevated at 167/81 mmHg and his pulse was 142 BPM. Tr. at 264. Dr. Reinhardt ordered intravenous Cardizem. Tr. at 265. An EKG showed atrial fibrillation with rapid ventricular response ("RVR"). Tr. at 266. Chest x-rays were normal. Tr. at 271.

Plaintiff presented to nurse practitioner Rachel Case ("NP Case") for ER follow up on March 7, 2017. Tr. at 508. NP Case noted Plaintiff's heart rate had improved after Cardizem was administered in the ER, but he reported having awoken with atrial fibrillation that morning. *Id.* She stated Plaintiff had called the office and received a prescription for short-acting Cardizem he took four hours prior. *Id.* Plaintiff reported the atrial fibrillation had subsided two hours prior. *Id.* He indicated he felt weak, but fair and was in no apparent distress. *Id.* His pulse was 103 BPM. *Id.* NP Case recorded normal findings on physical exam. Tr. at 510–11. She reviewed the EKG from the prior day that showed atrial fibrillation and ordered a new EKG that showed sinus rhythm. Tr. at 511. She consulted with Dr. Villareal, prescribed Cardizem CD 180 mg to replace Cardizem ER 120 mg, and instructed Plaintiff to take Cardizem 30 mg as needed up to twice a day for breakthrough atrial fibrillation. *Id.*

Plaintiff followed up with Dr. Villareal on March 23, 2017, to discuss possible repeat ablation surgery. Tr. at 523. He endorsed malaise/fatigue, irregular heartbeat, and palpitations on a review of systems. Tr. at 523–24.

Dr. Villareal recorded normal findings on physical exam. Tr. at 525–26. He assessed paroxysmal atrial fibrillation, AVNRT, status post-ablation of atrial fibrillation, status post-catheter ablation of slow pathway, inappropriate sinus tachycardia, and essential hypertension. Tr. at 526. He discussed with Plaintiff the risks of surgery and emphasized the ablation surgery would treat atrial fibrillation, but that he would continue to deal with inappropriate sinus tachycardia. Tr. at 527. Plaintiff opted to proceed, and Dr. Villareal ordered surgery be scheduled. Tr. at 526–27.

On April 4, 2017, Dr. Villareal performed a comprehensive electrophysiology study and catheter ablation of atrial fibrillation, three-dimensional mapping of arrhythmia, intracardiac echocardiography, supplemental linear ablation, and ablation of an additional tachycardic focus. Tr. at 366–73. On April 5, 2017, a transthoracic echocardiography report ("TTE") showed no apparent complications from the ablation procedure. Tr. at 383. Dr. Villareal discharged Plaintiff on April 7, 2017, with care precautions for his catheterization site, a prescription for Tikosyn, and instructions for light activity, lab studies and follow up visits. Tr. at 371–73.

Plaintiff followed up with NP Case for an EKG on April 11, 2017. Tr. at 539. NP Case described Plaintiff as appearing in no apparent distress and feeling well. *Id.* Plaintiff endorsed mild dysphasia over the prior weekend, but indicated it had resolved. *Id.* He also reported mild residual tenderness in

his groin area. *Id.* The EKG showed sinus rhythm with incomplete right bundle branch block. *Id.* NP Case encouraged Plaintiff to rest for the remainder of the week and to advance activity as tolerated the following week. *Id.*

Plaintiff denied recurrence of atrial fibrillation, but continued to endorse exertional dyspnea and episodes of tachycardia on May 5, 2017. Tr. at 542. NP Case noted normal findings on physical exam and sinus rhythm with nonspecific T-wave abnormalities. Tr. at 544–45. She ordered a 48-hour Holter monitor. Tr. at 545. Dr. Villareal also examined Plaintiff, increased Propranolol to 40 mg twice a day, and reinstated Corlanor 5 mg twice a day. Tr. at 546. NP Case indicated she would provide a work release if Plaintiff's symptoms improved the following week. *Id.*

On June 27, 2017, Plaintiff reported no atrial fibrillation, but continued exertional dyspnea and episodes of tachycardia. Tr. at 555. He indicated his FitBit and occasional vital signs checks at the local CVS showed his heart rate to range from 100 to 130 BPM at times. *Id.* He stated he felt "fatigued/tired and primarily [short of breath]" when his heart rate was in this range. *Id.* He noted nominal improvement on Corlanor and the increased dose of Propranolol. *Id.* He endorsed intermittent sharp, substernal chest pain lasting a couple of minutes at a time that was sometimes, but mostly unrelated to elevated heart rate. *Id.* He indicated the pain primarily occurred

when he was at rest and was associated with no aggravating factors. *Id.* Results of 48-hour Holter monitoring showed sinus rhythm and sinus tachycardia with a maximum heart rate of 146 BPM and occasional premature atrial and ventricular complexes, but no evidence of atrial or ventricular tachyarrhythmia, significant bradycardia or pauses, or symptom-related events. Tr. at 283.

Plaintiff followed up with Dr. Villareal on August 7, 2017. Tr. at 578. He reported exertional palpitations, effort intolerance, fatigue/malaise, chest pain, and lightheadedness. Tr. at 578–79. His blood pressure was elevated at 162/94 mmHg. Tr. at 580. Dr. Villareal recorded normal findings on physical exam. Tr. at 581. He stated Plaintiff's symptoms and history were most compatible with inappropriate sinus tachycardia, possibly related to vagal denervation from previous ablations. *Id.* In addition, he noted Plaintiff had a significant amount of deconditioning that could only get worse, as he became more sedentary. Tr. at 581–82. He increased Corlanor to 7.5 mg twice a day and encouraged Plaintiff to find an exercise routine. Tr. at 582.

On September 18, 2017, Plaintiff reported modest improvement in his heart rate and functional capacity, noting he continued to experience elevated heart rate two to three times a day that caused symptomatic deterioration and functional reduction. Tr. at 591. He endorsed malaise/fatigue, palpitations, and lightheadedness. Tr. at 591–92. Dr.

Villareal recorded normal findings on physical exam. Tr. at 594. He discontinued Tikosyn and Propranolol, continued Corlanor, and started Plaintiff on Metoprolol Succinate 25 mg twice a day. Tr. at 594–95.

On October 19, 2017, state agency medical consultant William Hopkins, M.D. ("Dr. Hopkins"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and avoid concentrated exposure to extreme heat, extreme cold, humidity, and hazards. Tr. at 55–56.

Plaintiff followed up with Dr. Villareal on December 1, 2017, and reported "decent" heart rate at rest after increasing Corlanor and rapid palpitations on exertion that Dr. Villareal indicated were predictable. Tr. at 620. Plaintiff endorsed malaise/fatigue and palpitations, on a review of systems. *Id.* Dr. Villareal recorded normal findings on physical exam. Tr. at 622–23. He characterized Plaintiff's situation as "[d]ifficult," noting he continued to experience debilitating symptoms with minimal exertion on higher dose Corlanor and Metoprolol that had limited his ability to return to work and rendered him unemployed and uninsured. Tr. at 624. He stated further escalation of Corlanor or Metoprolol was seemingly futile, but the only remaining option short of sinus node ablation and implantation of a

permanent pacemaker. Tr. at 625. Plaintiff agreed to increase Corlanor to a maximum dose of 10 mg twice a day. *Id.* Dr. Villareal encouraged Plaintiff to try aquatic-based exercise to reduce his heart rate response and try to improve his level of conditioning. *Id.*

On December 4, 2017, a second state agency medical consultant, Thomas O. Thomson, M.D. ("Dr. Thomson"), assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to extreme cold, extreme heat, humidity, and hazards. Tr. at 68–70.

On February 14, 2018, Dr. Villareal completed a physician questionnaire prepared by Plaintiff's counsel. Tr. at 659–63. It is set forth in detail below.

On May 31, 2018, Plaintiff presented to nurse practitioner Georges Godfrin ("NP Godfrin") at Good Shepherd Free Medical Clinic. Tr. at 629. He complained of significant cardiac tachyarrhythmia issues, fatigue, decreased functional capacity, shortness of breath, and increased heart rate, despite use of multiple medications. Tr. at 630. He also complained of sharp, short-lasting chest pain not associated with tachyarrhythmia. *Id.* NP Godfrin noted

normal findings on physical exam. *Id.* He assessed hypertension, tachyarrhythmia, obesity, gastroesophageal reflux disease ("GERD"), hypokalemia, and hypomagnesemia. *Id.* He advised Plaintiff to continue his current medications, lose weight, discontinue salt in his diet, decrease his alcohol intake, drink only water, exercise as able, and decrease his caloric intake. *Id.* He ordered lab studies and an EKG and referred Plaintiff back to Dr. Villareal. *Id.*

Plaintiff presented as a new patient to family nurse practitioner Jennifer Patterson ("NP Patterson") at Carolina Health Centers ("CHC") on June 25, 2018. Tr. at 665. He reported elevated heart rate and feeling lightheaded and tiring easily. *Id.* He indicated his only remaining medications were Xarelto and Corlanor, as he had been out of his other medications for five to six months. *Id.* His blood pressure was 134/86 mmHg and his pulse was 113 BPM. Tr. at 666. NP Patterson noted tachycardic heart rate at 110 BPM during physical exam, but otherwise normal findings. *Id.* She assessed sinus tachycardia, benign essential hypertension, and unspecified type atrial fibrillation. *Id.* She prescribed Metoprolol Succinate ER 25 mg twice a day and advised Plaintiff to sign up for a prescription assistance plan. Tr. at 667.

Plaintiff returned to CHC on July 21, 2018, and was seen by Christa McCann, M.D. ("Dr. McCann"). Tr. at 669. He indicated he had been

scheduled for a visit with Dr. Villareal on July 9, but was advised not to show for the appointment, as he had lost his insurance. *Id.* He reported his heart rate had been in the 130s. *Id.* Dr. McCann recorded normal findings on physical exam. Tr. at 671. She increased Metoprolol to 50 mg twice a day to address Plaintiff's tachycardia and continued Xarelto and Corlanor. Tr. at 672.

Plaintiff followed up with Dr. McCann for treatment of hypertension, tachycardia, and atrial fibrillation on October 17, 2018, and requested she complete disability paperwork. Tr. at 676. He reported doing well, but indicated he continued to experience a racing heart and had been unable to follow up with a cardiologist because he lacked insurance. *Id.* Dr. McCann noted Plaintiff's medications included Corlanor 5 mg, two tablets twice a day; Cardizem 30 mg, four times a day; Metoprolol 25 mg, twice a day; Propranolol 40 mg, three times a day; Xarelto 20 mg a day; and Pantoprazole 40 mg a day. *Id.* She provided Plaintiff a hospital sponsorship application as a potential option for following up with a cardiologist. *Id.* Plaintiff's blood pressure was elevated at 152/102 mmHg, and his pulse was 96 BPM. Tr. at 678. Dr. McCann recorded normal findings on physical exam. *Id.* She indicated she would refer Plaintiff to cardiology through Access Health, but noted he thought he already had a cardiology appointment scheduled for November 18 at the Internal Medicine Clinic. Tr. at 679. She indicated

"[f]unctional status assessment" as part of the plan in the visit record, Tr. at 678, but the record does not reflect a functional status assessment or disability paperwork.

On December 8, 2018, Dr. McCann reviewed Plaintiff's lab studies and prescribed high-dose Vitamin D. Tr. at 683.

Plaintiff returned to Dr. Manfredi for palpitations and increased blood pressure on January 4, 2019. Tr. at 638. He denied atrial fibrillation, but indicated his heart rate would increase to 120 BPM, especially after eating. *Id.* His blood pressure was 156/108 mmHg. *Id.* He reported taking 100 mg of Metoprolol twice a day. *Id.* An EKG showed normal sinus rhythm at 87 BPM. *Id.* Plaintiff endorsed dyspnea on exertion, irregular heartbeat, palpitations, dizziness, and lightheadedness. Tr. at 639. Dr. Manfredi recorded normal findings on physical exam. Tr. at 640. He ordered a 30-day event monitor and prescribed Lisinopril 10 mg daily. *Id.* He assessed palpitations, status post-atrial fibrillation radiofrequency ablation times two and AVNRT radiofrequency ablation, and hypertension. *Id.* He instructed Plaintiff to follow up in six weeks. *Id.*

Plaintiff wore the event monitor from January 5 through January 25, 2019. Tr. at 654. His symptomatic events included: shortness of breath and heart racing associated with sinus tachycardia and a heart rate of 122 BPM on January 5 at 4:54 PM; light headedness and heart racing associated with

sinus tachycardia and a heart rate of 136 BPM on January 6 at 11:08 AM; lightheadedness, shortness of breath, and heart racing associated with sinus tachycardia and a heart rate of 137 BPM on January 7 at 3:32 PM; asymptomatic tachycardia with a heart rate of 113 BPM on January 18 at 4:40 PM; and lightheadedness, shortness of breath, and heart racing associated with sinus tachycardia and a heart rate of 129 BPM on January 19 at 7:22 PM. *Id.* Plaintiff reported being at rest at the time of all triggering events. Tr. at 655–56. The event monitor also showed baseline sinus arrhythmia. Tr. at 654.

Plaintiff returned to Dr. Manfredi on March 11, 2019. Tr. at 647. Dr. Manfredi noted the event monitor showed sinus tachycardia correlating with Plaintiff's reported symptoms. *Id.* He noted normal findings on physical exam. Tr. at 649. He continued Plaintiff's medications and instructed him to follow up in a year. *Id.*

On July 23, 2019, Plaintiff presented to physician assistant Alejandra Medina Jimenez ("PA Jimenez") at CHC. Tr. at 687. He reported elevated blood pressure typically around 156/98 mmHg, with decreased systolic blood pressure at times and diastolic blood pressure consistently in the 90s. *Id.* He described occurrences of shortness of breath and chest pain lasting for three to four minutes and occurring during activity and while at rest. *Id.* He complained of elevated heart rate and feeling as if his heart were racing all

the time. *Id.* He stated his pulse typically ranged from 76 to 140 BPM. *Id.* He endorsed malaise/fatigue, shortness of breath, chest pain, palpitations, dizziness, and blood in stool on a review of systems. Tr. at 687–88. His blood pressure was 132/90 mmHg, and his pulse was 86 BPM. Tr. at 688. PA Jimenez noted normal findings on physical exam, aside from "tachycardia present." *Id.* She requested Plaintiff maintain a blood pressure log, as his blood pressure was controlled during the visit, despite his complaint that it was uncontrolled at home. Tr. at 689. She advised Plaintiff to follow up with the cardiologist as to tachycardia. *Id.*

Plaintiff returned to PA Jimenez on August 23, 2019. Tr. at 692. They reviewed Plaintiff's blood pressure log, which reflected blood pressures ranging from 134/87 to 158/102 mmHg. *Id.* Plaintiff indicated he was lying down and watching television when his blood pressure was at the highest. *Id.* He also reported his heart rate ranged from 87 to 139 BPM over the same period. *Id.* He endorsed shortness of breath with any activity and chest pain once or twice a week lasting for less than a minute. *Id.* A review of systems was positive for malaise/fatigue, shortness of breath, chest pain, palpitations, and blood in stool. Tr. at 695. Plaintiff's blood pressure was 134/90 mmHg, and his pulse was 90 BPM. *Id.* PA Jimenez recorded normal findings on physical exam. Tr. at 696. She encouraged Plaintiff to check on his hospital sponsorship and to set up an appointment with the cardiologist. *Id.* She

indicated Plaintiff should contact her if he was unable to schedule an appointment with the cardiologist, given his lack of insurance, as she would refer him to a cardiologist who would accept the hospital sponsorship. *Id.* She increased Lisinopril from 10 to 20 mg and prescribed Metoprolol Succinate ER 100 mg once a day. *Id.*

### C.    The Administrative Proceedings

#### 1.    The Administrative Hearing

##### a.    Plaintiff's Testimony

At the hearing on September 6, 2019, Plaintiff testified he had a driver's license and was able to drive, but sometimes had difficulty doing so. Tr. at 38. He said he sometimes felt lightheaded when his heart rate was elevated. *Id.* He noted this occurred seven to eight times a day and lasted for 20 minutes to an hour-and-a-half at a time. *Id.* He said he would lie down and try to cool off and relax when it occurred. *Id.*

Plaintiff testified he operated a forklift and unloaded trucks for American Services from 2005 to 2007. Tr. at 38–39. He stated he lifted 35 to 40 pounds in the job. Tr. at 39. He indicated he performed the same type of work for Renfro from 2007 to 2009. *Id.* He said he worked for DSD Solutions from 2009 to 2017 as a general warehouse associate, driving a forklift and picking tires. *Id.* He estimated lifting 175 to 180 pounds on that job. *Id.* He clarified he last worked around November 2016, but was paid into 2017 for

accrued vacation and personal time. Tr. at 39–40. He explained any additional earnings in 2017 were short-term disability benefits. Tr. at 40.

Plaintiff testified he stopped working due to atrial fibrillation and sinus tachycardia. *Id.* He stated he had undergone two ablation procedures. *Id.* He said his heart rate continued to go up seven or eight times a day. *Id.* He indicated his doctors had tried different medicines to control his heart rate without success and his main cardiologist had considered a pacemaker prior to Plaintiff losing insurance coverage. Tr. at 41. He stated he experienced chest pain twice a week lasting for 20 to 30 seconds. *Id.* He said he would lie down and try to relax when he felt it. *Id.*

Plaintiff testified sitting did not bother him, except when his heart rate was elevated. Tr. at 42. He estimated he could walk for 10 minutes, but noted his heart rate would go up if he tried to walk for a longer period. *Id.* He said he could stand for maybe 30 minutes at a time and lift 15 to 20 pounds. *Id.* He denied difficulty engaging in personal care activities, except when his heart rate became elevated, and noted that sometimes occurred while he showered. *Id.*

Plaintiff stated his medication caused dizziness and lightheadedness. Tr. at 43. He said he did not sleep well during the night because his heart rate would go up and he would be scared. *Id.* He denied napping during the

day, although he said he spent most of his time lying down. *Id.* He stated his grandmother prepared meals and performed the household chores. *Id.*

Plaintiff testified his heart rate sometimes went up while he was sitting still or lying down, but more frequently increased when he was engaging in exertional activities. Tr. at 44. He clarified Dr. Villareal had completed a questionnaire as to his heart condition and had performed his last ablation procedure in April 2017. Tr. at 44–45. He indicated his first ablation procedure was in November 2015. Tr. at 45.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Allison Shipp, Ph.D., reviewed the record and testified at the hearing. Tr. at 45–48. The VE categorized Plaintiff's PRW as a forklift operator, *Dictionary of Occupational Titles* ("*DOT*") No. 921.683-050, as requiring medium exertion and having a specific vocational preparation ("SVP") of 3, and a warehouse worker, *DOT* No. 922.687-058, as requiring medium exertion per the *DOT* and very heavy exertion as performed, and having an SVP of 2. Tr. at 46. The ALJ asked the VE if someone limited to light or sedentary work would be able to perform Plaintiff's PRW. *Id.* The VE stated the individual would not. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work, defined as lifting 20 pounds occasionally and 10 pounds frequently and sitting, standing, or walking up to six hours each in an eight-hour day with

no use of ladders; frequent climbing of stairs, stooping, crouching, kneeling, and crawling; no exposure to unprotected heights or dangerous, moving machinery; and occasional exposure to extreme heat, extreme cold, and humidity. *Id.* She asked if there would be work available for such an individual. *Id.* The VE identified light jobs with an SVP of 2 as a small parts assembler, *DOT* No. 706.684-022, an inspector and hand packager, *DOT* No. 559.687-074, and a cashier II, *DOT* No. 211.462-010, with 196,000, 315,000, and 1,276,000 positions in the national economy, respectively. Tr. at 47.

The ALJ asked the VE to consider the same individual, but to assume he would be limited to lifting 10 pounds occasionally and less than 10 pounds frequently, sitting up to six hours in an eight-hour workday, and standing or walking up to two hours in an eight-hour workday. *Id.* She asked if there would be jobs available. *Id.* The VE testified the individual could perform sedentary jobs with an SVP of 2 as a final assembler, *DOT* No. 713.687-018, a document preparer, *DOT* No. 249.587-018, and an order clerk, *DOT* No. 209.587-014, with 25,000, 91,000, and 18,000 positions in the economy, respectively. *Id.*

The ALJ asked the VE to consider that the individual would be unable to stay on task for two hours at a time or would require breaks in excess of the breaks typically permitted in a work environment. Tr. at 48. She asked if

the jobs previously identified or others would be available. *Id.* The VE testified that there would be no jobs. *Id.*

The ALJ asked the VE to consider the individual would be unable to consistently work eight hours a day, five days a week or would miss two or more days of work per month. *Id.* She asked if the jobs previously identified or any others would be available. *Id.* The VE stated there would be no jobs. *Id.*

The ALJ questioned whether the VE's testimony was consistent with the *DOT*. *Id.* The VE testified her testimony was consistent with the *DOT*, except that the *DOT* did not address off-task behavior, breaks, and absenteeism. *Id.* She explained she had based her testimony as to such limitations on her knowledge, education, and experience. *Id.*

2.    The ALJ's Findings

In her decision dated October 4, 2019, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.
2.    The claimant has not engaged in substantial gainful activity since November 28, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following combination of severe impairments: atrial fibrillation, congestive heart failure, tachycardia, high blood pressure, and obesity (20 CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant could never climb ladders and frequently climb stairs, stoop, crouch, kneel, or crawl. He could have no exposure to unprotected heights or dangerous moving machinery. He could have occasional exposure to extreme cold, extreme heat, and humidity.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on May 8, 1978 and was 38 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 28, 2016, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 17–26.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ did not properly evaluate Plaintiff's treating physician's opinion; and

2) the ALJ did not account for all of Plaintiff's limitations in the RFC assessment.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied

the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Dr. Villareal's Opinion

Dr. Villareal completed a medical opinion form on February 14, 2018. Tr. at 659–63. He stated he had been in contact with Plaintiff since 2016 as to cardiac arrhythmia. Tr. at 659. He identified Plaintiff's diagnosis as paroxysmal atrial fibrillation. *Id.* He explained Plaintiff's impairments were confirmed by Holter/event monitor that showed tachycardia, EKG, echocardiogram, and nuclear stress test. *Id.* He identified Plaintiff's symptoms as shortness of breath, fatigue, and palpitations. *Id.* He confirmed Plaintiff experienced marked limitation of physical activity, as demonstrated by fatigue, palpitations, dyspnea, or anginal discomfort on ordinary physical activity, even though he was comfortable at rest. Tr. at 660. He found Plaintiff was capable of low stress jobs, explaining stressful situations may potentially lead to symptomatic episodes. *Id.* He indicated Plaintiff's physical symptoms and limitations caused emotional difficulties such as depression or chronic anxiety. *Id.* He noted Plaintiff was frustrated with his inability to maintain a "normal life" without symptoms "interrupting" daily activities, such as working. *Id.* He stated emotional factors could potentially contribute to the severity of Plaintiff's subjective symptoms and functional limitations. *Id.*

Dr. Villareal noted Plaintiff's experience of cardiac symptoms was often severe enough to interfere with attention and concentration. Tr. at 661. He considered Plaintiff's impairments reasonably consistent with the symptoms and functional limitations he described, explaining: "He continues to have debilitating symptoms w[ith] minimal exertion [and] has limited his ability to work." *Id.* He noted Plaintiff was taking a blood thinner that might lead to difficulty stopping a bleed following an injury and was taking medication intended to keep his heart rate in check that could lead to lowered blood pressure and cause easy fatigability. *Id.* He confirmed Plaintiff's impairments had lasted or were expected to last for at least 12 months. *Id.*

Dr. Villareal estimated Plaintiff could walk one to two city blocks without rest, sit for more than two hours at a time, stand for two hours at a time, sit for about four hours in an eight-hour workday, and stand/walk for less than two hours in an eight-hour workday. Tr. at 661–62. He indicated Plaintiff would need a job that permitted shifting positions at will from sitting, standing, or walking. Tr. at 662. He estimated Plaintiff could frequently lift less than 10 pounds, occasionally lift 10 pounds, and rarely lift 20 pounds. Tr. at 663. He felt Plaintiff could occasionally twist, rarely stoop (bend) and crouch, and never climb ladders and stairs. *Id.* He indicated Plaintiff should avoid concentrated exposure to extreme heat, humidity, hazards, fumes, odors, dusts, gases, and poor ventilation. *Id.* He estimated

28

Plaintiff would likely be absent from work on two days per month due to his impairments or treatment. *Id.*

Plaintiff argues the ALJ gave only partial weight to Dr. Villareal's opinion because she did not agree with it. [ECF No. 17 at 8–29]. He maintains Dr. Villareal set forth limitations in his opinion that would preclude all work. *Id.* at 8–10. He claims the medical evidence supports the restrictions Dr. Villareal indicated in his opinion. *Id.* at 10–20. He contends substantial evidence does not support the ALJ's stated reasons for rejecting portions of Dr. Villareal's opinion. *Id.* at 20. He maintains Dr. Villareal limited him to low stress work because exposure to stress could cause elevated heart rate, blood pressure, and palpitations. *Id.* at 22–23; ECF No. 19 at 1–2. He notes the record supports Dr. Villareal's opinion as to depression, anxiety, and impaired concentration, as his limitations caused depression and anxiety and interrupted his sleep and palpitations distracted him. *Id.* at 23–24; ECF No. 19 at 2–3. He claims the record supports Dr. Villareal's opinion as to absences, given evidence of lengthy episodes of palpitations, exertional dyspnea, shortness of breath, racing heart rate, dizziness, lightheadedness, and significant fatigue. *Id.* at 24–25. He maintains the ALJ erred in accepting opinions of the state agency consultants, specialists in gynecology and emergency medicine, over the opinion of his treating cardiologist. *Id.* at 25–26; ECF No. 19 at 5. He

indicates the ALJ erred in claiming he received no treatment for cardiac problems between December 2017 and January 2019, as he received treatment in May 2018, and the infrequency of treatment over this period was due to his lack of health insurance, not an absence of severe symptoms. *Id.* at 26; ECF No. 19 at 5–6. He claims the ALJ did not consider the required regulatory factors in evaluating the persuasiveness of Dr. Villareal's opinion. *Id.* at 28; ECF No. 19 at 6. He maintains the ALJ erroneously substituted her lay opinion for that of a medical expert. *Id.* at 29; ECF No. 19 at 4, 6.

The Commissioner argues the ALJ appropriately considered the persuasiveness of Dr. Villareal's opinion in accordance with the new regulation, which no longer requires any special weight be accorded to a treating medical source's opinion. [ECF No. 18 at 9–10]. He maintains the ALJ appropriately noted the record did not support Dr. Villareal's opinions that Plaintiff was limited to low-stress jobs, had depression or chronic anxiety, had problems with attention and concentration, would be absent from work two days per month, and could not meet the exertional demands of sedentary work. *Id.* at 11. He claims the ALJ credited Dr. Villareal's opinion to the extent she limited Plaintiff to sedentary work. *Id.* He notes the ALJ did not find the state agency medical consultants' opinions persuasive, as they opined Plaintiff could perform medium work, but credited them in concluding Plaintiff's cardiac impairments were not as limiting as Dr. Villareal alleged.

*Id.* at 12. He contends the ALJ did not substitute her lay opinion for that of a medical expert, but, instead, evaluated and discussed the evidence to explain why she did not consider Dr. Villareal's opinion fully persuasive. *Id.* at 14.

For claims filed after March 27, 2017, the applicable regulation requires ALJs consider how persuasive they considered each medical opinion of record to be, given the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1520c(b), (c). The ALJ is not to defer to or give any specific evidentiary weight to any medical opinion, including one from a claimant's treating medical source. 20 C.F.R. § 404.1520c(a). Supportability and consistency are more important than the other factors, and the ALJ is required to explain how she considered these two factors in evaluating each medical opinion. 20 C.F.R. § 404.1520c(a), (b)(2). She may, but is not required, to explain how she considered the other factors. 20 C.F.R. § 404.1520c(b)(2).

In evaluating the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinion will be." 20 C.F.R. § 404.1520c(c)(1). As for consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the

more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2).

The ALJ summarized Dr. Villareal's opinion, finding it "partially persuasive" to the extent it supported an RFC for a reduced range of sedentary exertion. Tr. at 21–22. She explained as follows:

> The record supports that the claimant has cardiac impairments, including tachycardia, and that he has undergone two cardiac ablations. Holter monitor supports that the claimant has tachycardia even at rest. However, the record as a whole does not support Dr. Villareal's statement, which indicates that he could not perform even sedentary exertion on a sustained basis. The record does not substantiate that the claimant is limited to low-stress jobs, that he has depression or chronic anxiety, or that he has problems with concentration and attention. The record does not support that the claimant would be absent from work 2 days per month. The record does not support that the claimant is precluded from performing the exertional demands of sedentary exertion, as proposed by Dr. Villareal. Nonetheless, I have limited the claimant to a reduced range of sedentary exertion, in part, due to Dr. Villareal's remarks.

Tr. at 22.

The undersigned has compared and contrasted Dr. Villareal's opinion and the ALJ's RFC assessment. Consistent with the ALJ's representation she considered Dr. Villareal's opinion "partially persuasive," she credited in the RFC assessment his impressions that Plaintiff could meet the lifting requirements of sedentary work, could engage in more frequent sitting than standing or walking, could never climb ladders, and should have limited

exposure to hazards, extreme heat, and humidity. *Compare* Tr. at 19, *with* Tr. at 661–63.

The ALJ rejected Dr. Villareal's opinion to the extent she concluded "[t]he record as a whole d[id] not indicate the need for additional restrictions in the residual functional capacity, including those related to exertional demands, postural activities, manipulative actions, environmental exposures . . . or mental demands, such as breaks throughout the workday, absences from work, concentration, persistence, pace, or socialization." Tr. at 25.

The undersigned rejects Plaintiff's argument the ALJ substituted her lay opinion for that of a medical expert. The ALJ cited sufficient medical evidence to support her acceptance of portions of Dr. Villareal's opinion and her rejection of other portions. Pursuant to 20 C.F.R. § 404.1520c, the ALJ has a duty to assess the persuasiveness of the entirety of the opinion in light of the record as a whole.

In evaluating support for Dr. Villareal's opinion in treatment notes, the ALJ pointed to specific findings that were contrary to his assertions Plaintiff was limited to low-stress jobs, experienced depression or anxiety, had difficulty with attention and concentration, and could not perform even sedentary work over the course of a normal workday. *See* Tr. at 22–25. Contrary to Plaintiff's assertion in his reply to the Commissioner's brief, ECF No. 19 at 1–3, the ALJ acknowledged Dr. Villareal's rationale that exposure

to stressful events could increase Plaintiff's heart rate and blood pressure and lead to palpitations; that his physical limitations caused emotional difficulties such as depression and anxiety; and that his cardiac symptoms were often severe enough to affect his attention and concentration. Tr. at 21–22. However, she pointed to Dr. Villareal's observations that Plaintiff "routinely had high blood pressure and high pulse rate" during visits, but noted that "despite this fact, he was consistently alert, oriented, and in no distress." Tr. at 24. She further explained:

> He had good oxygen saturation readings. The heart had normal rate, regular rhythm, S1 normal, S2 normal, intact distal pulses, non-displaced PMI, no S3 or S4, no friction or rub, and no midsystolic click. There was no gallop or murmur. His pulses were 2+ throughout. He had normal effort breathing, normal breath sounds, no wheezes, and no rales. His skin was warm, dry, and non-diaphoretic. He had no edema. He had normal mood and affect (3F/5, 18, 33, 38, 53, 66, 88, 89, 101, 102; 4F/6; 5F/4).

Tr. at 24.

In considering the consistency of Dr. Villareal's opinion with the other evidence of record, the ALJ noted inconsistency between his opinion and those of the state agency medical consultants. Contrary to Plaintiff's assertion, the ALJ did not credit the state agency consultants' opinions over those of his treating physician. In fact, she found the record did not support the state agency medical consultants' opinions that Plaintiff could "perform a range of medium exertion." Tr. at 22. However, she credited their review of Dr. Villareal's treatment notes and their opinions to the extent they

concluded "the severity of [Plaintiff's] cardiac impairments [was] not as limiting as Dr. Villareal and [Plaintiff] portray them to be." *Id.*

In further examining the consistency factor, the ALJ concluded "[t]he record as a whole d[id] not fully support [Plaintiff's] allegations regarding the frequency of his tachycardic episodes or the limiting effects of each episode." *Id.* She had previously noted Dr. Villareal's opinion fully supported Plaintiff's allegations. *See* Tr. at 21. Thus, her statement may be interpreted as also indicating the record as a whole did not fully support Dr. Villareal's opinion.

The ALJ noted Plaintiff alleged he could do some driving, lift 15 to 20 pounds, had chest pain twice a week that lasted a few seconds at most, had no difficulty sitting in a chair, had problems with bathing and dressing during periods of tachycardia, experienced increased heart rate on exertion, and did not often nap during the day, despite poor sleep at night. Tr. at 22–23. She recognized Plaintiff's reports of symptoms included irregular heartbeat, tachycardia, dyspnea on exertion, and palpitations. Tr. at 23. However, she further noted Plaintiff had denied other symptoms, including chest pain, claudication, cyanosis, leg swelling, near-syncope, orthopnea, paroxysmal nocturnal dyspnea, and syncope and was negative for cough, hemoptysis, shortness of breath, sleep disturbances due to breathing, snoring, sputum production, wheezing, nail changes, color change, dry skin, flushing, itching, poor wound healing, rash, suspicious lesions, unusual hair

distribution, aphonia, brief paralysis, difficulty with concentration, disturbances in coordination, excessive daytime sleepiness, dizziness, focal weakness, lightheadedness, loss of balance, numbness, paresthesias, seizures, sensory change, tremors, vertigo, altered mental status, depression, hallucinations, hypervigilance, memory loss, substance abuse, suicidal thoughts, thoughts of violence, insomnia, and nervousness/anxiousness. Tr. at 23–24.

The ALJ noted normal findings as to many measures of cardiac functioning, summarizing the evidence as follows:

> The claimant has atrial fibrillation status post ablation as recently as April 2017 (2F/93) with AVN re-entry tachycardia and inappropriate sinus tachycardia, but there is little evidence of cardiomyopathy or ischemic heart disease. He has a history of paroxysmal atrial fibrillation and inappropriate sinus tachycardia, as well as difficulty managing drug strategies for competing problems. Bruce protocol in December 2016 showed that the claimant walked 9 minutes with no ischemia and good exercise tolerance. He has no coronary artery disease. He has had normal echocardiogram with good ejection fraction. Since the April 2017 ablation, the claimant has experience few, if any, additional episodes of atrial fibrillation, which has allowed for escalating dosages of medications for inappropriate sinus tachycardia. Holter monitor in July 2017 showed no atrial fibrillation, occasional PAC/PVC, no bradycardia or pauses, NSR, and sinus tachycardia (2F/5, 5A/9).

Tr. at 23. Plaintiff argues these and other signs the ALJ referenced remained mostly normal both before and after the April 2017 ablation and did not undermine Dr. Villareal's assessment of significant impairment. [ECF No. 19 at 4–5]. While it is correct that many of the cardiac measures remained the

same throughout the course of treatment, the ALJ did not err in citing these normal findings in combination with other evidence to support her evaluation of the persuasiveness of Dr. Villareal's opinion.

In concluding Dr. Villareal's opinion was not entirely consistent with the record, the ALJ noted significant evidence showed Plaintiff's incidents of tachycardia were not as limiting as he or Dr. Villareal alleged. Although Dr. Villareal indicated Plaintiff's tachycardic episodes would occur so frequently he could not meet the requirements of sedentary work over a normal workday, the ALJ noted that other providers' records showed him to "function[] relatively well" even when he had "active cardiac symptoms, such as elevated blood pressure and heart rate." *Id.* She pointed to a January 2017 ER visit in which Plaintiff was described as "in no distress or pain and actively watching TV," despite having elevated blood pressure and a pulse of 112 BPM. *Id.* She also cited a March 2017 ER visit during which Plaintiff was "in no distress or pain," oriented with normal affect, and had clear speech, normal level of consciousness, normal judgment, no motor deficits, intact sensation, no edema, equal pulses, no heart murmur, normal respiratory effort, 100% oxygen saturation, and normal chest x-ray, despite elevated blood pressure and pulse rate of 142 BPM. *Id.*

The ALJ explained the record showed generally conservative treatment since April 2017. *Id.* She noted Plaintiff had required few ER visits and hospitalizations for cardiac symptoms. *Id.*

The record supports Plaintiff's claim that his failure to obtain treatment from a cardiologist between December 2017 and January 2019 was due to his loss of insurance. The ALJ is not permitted to find an individual's symptoms inconsistent with the evidence in the record based on his failure to seek more frequent treatment "without considering possible reasons he [] may not comply with treatment or seek treatment consistent with the degree of his [] complaints." SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). The ALJ noted that Plaintiff had "a gap in cardiology records" between his last visit with Dr. Villareal in December 2017 and his January 2019 visit with Dr. Manfredi. Tr. at 24. This is consistent with the record. 620–25, 638–40. She did not specifically address the reason for the "gap." However, it does not appear she relied on it to discredit Plaintiff's allegations or Dr. Villareal's opinion as to symptom severity, but more to note that Plaintiff last saw Dr. Villareal in December 2017. She recognized Plaintiff had received "intervening treatment at Good Shepherd Free Clinic and Laurens County Community Care," and noted he "reported having significant cardiac tachy-arrhythmia, fatigue, decreased functional capacity, shortness of breath, increased heart rate, and some chest pains," during his May 2018 visit to

Good Shepherd, "complained of cardiac symptoms, such as palpitations, racing heart, and lightheadedness" during visits to Laurens County Community Care, and endorsed "malaise/fatigue, shortness of breath, and chest pain" in July 2019. Tr. at 24. As with the other records, the ALJ acknowledged Plaintiff's complaints and abnormal findings as to blood pressure and heart rate, but referenced a myriad of normal findings during these providers' physical, neurological, and psychological exams. *See id.*

The ALJ also found the recent cardiology records included Plaintiff's complaints of cardiac symptoms, but showed normal physical, neurological, and psychological examinations, aside from "elevated blood pressure and high heart rate." *See id.* She cited the normal findings and noted Dr. Manfredi did not recommend cardiology follow up for a year. Tr. at 24–25.

Plaintiff cites evidence of atrial fibrillation between December 2016 and April 2017, abnormal findings on EKGs, tachycardia on Holter monitor, elevated blood pressure and pulse, medication changes to address symptoms, and complaints of intermittent chest pain, shortness of breath, exertional dyspnea, impaired sleep, fast heart rate, asthenia, malaise/fatigue, dizziness, lightheadedness, and palpitations. ECF No. 17 at 10–20. The ALJ considered the same evidence and rationally explained it supported a restriction to sedentary work with some additional restrictions. *See* Tr. at 21–25. However, she also cited the evidence she discussed above and explained the record was

not wholly consistent with the restrictions Dr. Villareal provided. *See id.* She considered the entire record in assessing Dr. Villareal's opinion and did not substitute her lay opinion contravention of Fourth Circuit precedent.

The ALJ's decision shows she considered the five factors relevant to persuasiveness in 20 C.F.R. § 404.1520c. As an initial matter, the undersigned reiterates that, although 20 C.F.R. § 404.1520c requires the ALJ consider all medical opinions based on the five enumerated factors, it does not require the ALJ to explain in the decision how she considered the last three. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ explicitly discussed the supportability and consistency factors, and it is evident from her decision that she considered Dr. Villareal's treatment relationship with Plaintiff and his specialization as a cardiologist. *See* Tr. at 21 (identifying Dr. Villareal as a cardiologist); Tr. at 23–24 (discussing the review of systems in Dr. Villareal's records); Tr. at 24 (citing findings in Dr. Villareal's treatment records and noting it did not appear he had treated Plaintiff since December 2017).

The ALJ's decision does not support Plaintiff's argument she rejected Dr. Villareal's opinion because she did not agree with it. As discussed above, the ALJ cited specific findings within Dr. Villareal's treatment notes and throughout the remainder of the record that failed to support and were inconsistent with some of the restrictions he identified in his opinion.

Substantial evidence supports her finding that Dr. Villareal's opinion was partially persuasive in that it supported a restriction to sedentary work with restrictions on climbing and some environmental factors, but was unsupported by his own findings and the record as a whole to the extent he suggested Plaintiff had additional postural and mental restrictions, could not complete an eight-hour workday without excessive breaks, and would be absent from work at least twice a month.

### 2. RFC Assessment

Plaintiff argues the ALJ neither accounted for all his restrictions in the RFC assessment, nor provided reasons for rejecting the alleged restrictions. [ECF No. 17 at 30]. He maintains the ALJ found he could perform frequent stair climbing, despite evidence of rapid heart rate with minimal or no provocation and debilitating symptoms with minimal exertion. *Id.* at 30–31. He contends the ALJ included in the RFC assessment no provision for additional rest periods, despite evidence he had to lie down and rest when he experienced inappropriate sinus tachycardia. *Id.* at 31–32; ECF No. 19 at 7.

The Commissioner argues the ALJ provided a narrative discussion of the pertinent evidence that enabled meaningful review and was not required to discuss every piece of evidence. [ECF No. 18 at 15]. He maintains Plaintiff's complaints as to the ALJ's inclusion in the RFC assessment of frequent stair climbing and other postural maneuvers would amount to

harmless error at most, as the jobs the ALJ cited required no climbing, balancing, stooping, kneeling, crouching, or crawling. *Id.* at 15–16.

A claimant's RFC represents "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ is required to "consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine on a function-by-function basis, how they affect [his] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin* 826 F.3d 176, 188 (4th Cir. 2016)). She should consider all the relevant evidence and account for all the claimant's medically-determinable impairments in the RFC assessment. 20 C.F.R. § 404.1545(a). She must provide a narrative discussion that includes "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explains how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. She "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* In *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), the court provided that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

The ALJ explained she had limited Plaintiff "to a range of sedentary exertion with additional postural and environmental limitations" based on his "alleged combination of conditions and symptoms, including those involving the heart, as well as in consideration of the possible exacerbating effects of obesity, the possible contributing effect of the "nonsevere" impairments, potential negative side effects of medications and in contemplation of [his] subjective complaints, including chest pain, fatigue, weakness, poor sleep, dizziness, and lightheadedness." Tr. at 21. She noted Plaintiff's activities of daily living included living at home, driving some, lifting 15 to 20 pounds, experiencing chest pain for a few seconds twice a week, sitting without difficulty, not sleeping well at night, not napping during most days, experiencing increased heart rate upon exertion, and bathing and dressing without difficulty, except during periods of tachycardia. Tr. at 22–23.

The ALJ found Plaintiff could engage in frequent stair climbing and other frequent postural activities, despite her acknowledgement of evidence that he experienced increased heart rate upon exertion. *See* Tr. at 19, 23. She committed error in that her decision fails to reconcile these findings. However, as the Commissioner points out, the ALJ identified three jobs at step five that do not require stair climbing or other frequent postural activities. *See* 713.687-018, FINAL ASSEMBLER. *DOT* (4th Ed., Rev. 1991),

43

1991 WL 679271; 249.587-018, DOCUMENT PREPARER, MICROFILMING. *DOT* (4th Ed., Rev. 1991), 1991 WL 672349; 209.567-014, ORDER CLERK, FOOD AND BEVERAGE. *DOT* (4th Ed., Rev. 1991), 1991 WL 671794 (all indicating "Not Present" as to climbing, balancing, stooping, kneeling, crouching, and crawling). Therefore, the ALJ's failure to reconcile the provision in the RFC assessment for frequent stair climbing and other postural activities with evidence to the contrary was harmless. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding harmless error where "the ALJ conducted the proper analysis in a comprehensive fashion, "cited substantial evidence to support his finding," and "there is no question but that he would have reached the same result notwithstanding his initial error").

The ALJ's decision shows she explicitly considered and declined to credit Plaintiff's allegation as to a need for additional rest periods to lie down to address symptoms of sinus tachycardia. She specifically noted: "The claimant testified that he becomes lightheaded and dizzy when his heartrate goes up, which happens 7 or 8 times per day. Each episode lasts 20 minutes up to 1.5 hours, during which time he has to lie down and relax." Tr. at 20. She further acknowledged Plaintiff's testimony that "[h]e spends most of the day lying down." *Id.* However, she found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely

44

consistent with the evidence. *Id.* More specifically, she stated "[t]he record as a whole does not fully support the claimant's allegations regarding the frequency of his tachycardic episodes or the limiting effects of each episode." Tr. at 22. She further indicated: "Even when the claimant complains of cardiac symptoms, or he has active cardiac symptoms, such as elevated blood pressure and heart rate, he functions relatively well." Tr. at 23. She referenced multiple physicians' observations that Plaintiff appeared normal and not in distress even when he was experiencing acute episodes of high blood pressure and tachycardia. *See* Tr. at 23–25. She specifically stated the record "d[id] not indicate the need for additional restrictions . . . including . . . breaks throughout the workday." Tr. at 25.

The court finds substantial evidence supports the ALJ's RFC assessment, given her explanation for the limitations included and rejected and the harmless error in her failure to address evidence that arguably supported additional postural restrictions.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

May 7, 2021
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge